The foregoing opinion by STOCKARD, C., is adopted as the opinion of the Court.

All of the Judges concur.

**ST. LOUIS COUNTY WATER COMPANY, a Missouri Corporation, Appellant,**

v.

**STATE HIGHWAY COMMISSION of Missouri, Respondent.**

No. 51953.

Supreme Court of Missouri, Division No. 1.

Dec. 30, 1966.

Motion for Rehearing or to Transfer to Court En Banc Denied Feb. 13, 1967.

Opinion Modified on Court's own Motion Feb. 13, 1967.

Gerald K. Presberg, St. Louis, for plaintiff-appellant.

Robert L. Hyder, Bruce A. Ring, Jefferson City, for respondent.

HIGGINS, Commissioner.

Proceeding under Section 536.100 et seq., V.A.M.S., for judicial review of an order of the State Highway Commission, affirmed by the circuit court, directing St. Louis County Water Company to relocate certain of its facilities located in state highway right of way at a cost to the Company in excess of $15,000.

This is the second appeal in this matter, the first being reported at 386 S.W.2d 119; and, in order to provide background and continuity, much of the case as there stated is set out.

1. Section 227.240, V.A.M.S., in pertinent part provides:
"1. The location and removal of all telephone, telegraph and electric light and power transmission lines, poles, wires, and conduits and all pipe lines and tram-

"Commission Project F–610(11) was for the improvement of some 8200 feet of Lindbergh Boulevard (Route 66TR) in the vicinity of its intersection with Page Boulevard in St. Louis County. The plans called for elimination of a number of curves in Lindbergh, the construction of a cloverleaf interchange at the Page Boulevard intersection and an underpass under tracks of the Rock Island Railroad. The reconstructed highway was to consist of two 24–foot roadways, paved with concrete and separated by a medial strip, with stabilized shoulders.

"In 1947, pursuant to a permit issued by the commission, the company had installed a 20–inch water main in the highway right-of-way for more than 6 miles along Lindbergh, which included the area involved in Project F–610(11). The permit called for the installation of the main 8 feet west of the west edge of Lindbergh Boulevard. This main is the principal facility involved in the proceeding under review.

"After conferring with water company representatives, the commission, on May 31, 1961, through its district engineer, issued an order approving plans for the location of the water company's facilities in the improvement area. Of some 8200 feet of 20–inch line involved, some 2000 feet in locations not affected by the new construction were to remain in place. The company agreed to the relocation of some 2000 feet of the line situated in sites in which the grade of the existing roadway was to be changed, including the Page Boulevard and Rock Island underpasses. Some 4200 feet of the 20–inch line were to be abandoned and relocated, along with 580 feet of 8–inch line.

"The order, pursuant to Section 227.240, supra,[1] notified the company that a hearing

ways, erected or constructed, or hereafter to be erected or constructed by any corporation, association or persons, within the right of way of any state highway, insofar as the public travel and traffic is concerned, and insofar as the same

would be held on the commission's proposal involving the company's facilities. A hearing was held at which evidence was presented by representatives of the highway department and of the company. Following the hearing, the commission issued the order presently involved, requiring the abandonment of some 2775 feet of 20–inch line in three separate locations and approximately 300 feet of 8–inch line.

"The first location in which changes in the company's facilities were ordered was in the vicinity of the intersection of Dorsett Road with Lindbergh. There the roadway was to be widened by the adding of new pavement on both sides of the existing pavement. The order called for the retirement of some 1275 feet of 20–inch main which would have been under the new pavement at distances, measured from the west edge of the pavement, of from 10 to 20 feet. It also called for the retirement of 300 feet of 8–inch main which would have been under the new pavement by a maximum of 20 feet and a minimum of 10 feet from its west edge.

"The second and third locations were in areas where curves in the existing road were straightened. In both the second and third relocation sites, the 20–inch main would have crossed the new roadway beneath new pavement at oblique angles

which would have placed some 550 feet of main under the roadway in the second relocation site. In that site some 650 feet of 20–inch main were to be retired, consisting of the 550 feet which would have been under the pavement and 100 feet which would have been in the shoulder of the roadway. In the third site, 450 feet of 20–inch main which would have been beneath the new paved roadway and some 400 feet of the main which would have been in the shoulder of the new roadway were ordered retired or removed.

"The order submitted approved relocations of the mains to be retired or removed. Generally, the relocations were near the edge of the right-of-way of the highway as improved. Where crossings of the new roadway were to be made to rejoin portions of the main left in use, the lines crossed the roadway at angles which made the portion of the line beneath the pavement approximately the same length as the width of the pavement at the point of crossing.

"By its final order, the commission found that the highway improvement involved the construction of a hard surface highway; that facilities of the company ordered relocated would be either covered with hard surface pavement or incorporated in the shoulders of the roadway; that some of the facilities, if left in place, would cross

may interfere with the construction or maintenance of any such highway, shall be under the control and supervision of the state highway commission.

"2. The commission or some officer selected by the commission shall serve a written notice upon the person or corporation owning or maintaining any such lines, poles, wires, conduits, pipe lines, or tramways, which notice shall contain a plan or chart indicating the places on the right of way at which such lines, poles, wires, conduits, pipe lines or tramways may be maintained. The notice shall also state the time when the work of hard surfacing said roads is proposed to commence, and shall further state that a hearing shall be had upon the proposed plan of location and matters incidental thereto, giving the place and date of such hearing. Immediately after such hearing the said owner shall be given a notice of

the findings and orders of the commission and shall be given a reasonable time thereafter to comply therewith; provided, however, that the effect of any change ordered by the commission shall not be to remove all or any part of such lines, poles, wires, conduits, pipe lines or tramways from the right of way of the highway. The removal of the same shall be made at the cost and expense of the owners thereof unless otherwise provided by said commission, and in the event of the failure of such owners to remove the same at the time so determined they may be removed by the state highway commission, or under its direction, and the cost thereof collected from such owners, and such owners shall not be liable in any way to any person for the placing and maintaining of such lines, poles, wires, conduits, pipe lines and tramways at the places prescribed by the commission."

under the new paved roadway 'on a sharp skew angle, thereby creating a crossing of considerable length; that other parts of the facilities, if let (sic) in place, will be under the shoulder of the roadway or under the pavement to varying extents; and that the presence of a part of said facilities will interfere with the proper and economical construction and maintenance of said highway and will impede the lawful traffic thereon after reconstructed * * *.'

"* * * On this appeal, the company first contends that the relocation order is unsupported by competent and substantial evidence upon the whole record and is arbitrary, capricious and unreasonable. The company contends further that the order of the commission is in excess of its authority and not authorized by law because it was based not upon the evidence adduced at the hearing but upon a previously adopted policy of the commission. Inasmuch as we conclude that this second contention is dispositive of this appeal, we turn to it.

"At the hearing, the commission placed in evidence a pamphlet entitled 'A POLICY ON LOCATION OF UTILITY FACILITIES ON STATE HIGHWAYS.' According to the pamphlet, the policy had been established by the Missouri State Highway Commission on October 14, 1958. The witness who identified the pamphlet stated that the provisions under portions of the policy statement dealing with 'HIGH TYPE ROADS' applied in this case. The portions which he pointed out as being applicable were as follows:

" 'II. HIGH TYPE ROADS.

" 'A. *Existing Roadway Included in Final Improvement and Existing Utility Facilities on Present Right-of-Way.*

" '1. Relocate all parallel surface installations and parallel underground installations carrying pressure to near the new right-of-way lines.

" ' * * *

" '3. All underground mainline pipes under pressure crossing the roadway shall be encased from shoulder to shoulder of roadway as a minimum.'

"The statement of policy is prefaced as follows:

" 'The following policy is established for the location or relocation of utility facilities on the right-of-way of highways in the state highway system. Any location or relocation of utility facilities contrary to this policy is declared to be an interference with the construction or maintenance of state highways and their rights-of-way and is prohibited.' * * *

"We deem it unnecessary here to set out in detail the controverted evidence presented at the hearing and concerning which no basic findings were made."

The opinion then noted a portion of the evidence but, in respect to any consideration of same, proceeded:

"We do not deem it our proper function to decide, in this case, whether or not the commission could, on the basis of this and other evidence presented, have found basic facts to support its ultimate finding. 'The Commission is the fact-finding body, and the Court examines the evidence not to make findings for the Commission but to ascertain whether its findings are properly supported.' * * *."

The court then concluded:

"Support for the conclusion that the mere presence of the mains would constitute interference with the construction, maintenance and use of the new highway is found only in the commission's declaration of policy to that effect. We, therefore, must conclude that, the commission having made no basic findings from the evidence adduced at the hearing, the commission's ultimate finding was based upon the previously established policy, and not upon the evidence adduced at the hearing. As pointed out in

Weinstein, supra (State ex rel. State Highway Commission v. Weinstein, Mo., 322 S. W.2d 778), such is not a proper basis for determination of the matter.

"Inasmuch as the commission made no findings pertaining to the issues properly determinative of this case, the matter should be remanded to the commission for such determination.

"Therefore, the judgment of the circuit court affirming the commission's order is reversed and the cause remanded to the circuit court with directions to remand to the commission for further proceedings in accordance with this opinion."

Pursuant to the foregoing order of the Supreme Court, the Circuit Court of St. Louis County remanded the cause to the Commission for further proceedings, and thereafter the Commission entered its findings and order as per Order In The Matter Of The Relocation Of Water Distribution Facilities, Route 66TR, St. Louis County, Project F–610(11). It was served on the Company September 30, 1965, and, after a history of the case, proceeded:

"The transcript of all evidence has been furnished to all members of the present Commission and, after said transcript being read and considered by each member of the present Commission, the Commission finds as follows:

"Certain water transportation and distribution facilities owned by the St. Louis County Water Company shown on the plans originally served upon said Company as Exhibit 'A' to the original notice dated May 31, 1961, are presently located within the right-of-way of a public State highway. The facilities of the Company are located within said right-of-way pursuant to the terms of a permit issued to said Company by the State Highway Commission on October 8, 1946. At the time of the original notice dated May 31, 1961, directed to the St. Louis County Water Company, the Commission had scheduled Route 66TR, St. Louis County, Project F–610(11), for reconstruction

in the immediate future thereafter. The plans of the Commission provided for hard surfacing of the reconstructed highway. The facilities of the St. Louis County Water Company which Commission's engineer had directed to be relocated, if left in place, would, after the reconstruction of the highway, be either covered with hard surface pavement or underneath the shoulders of the roadway. Some of said facilities, if left in place, are so located in reference to the proposed highway improvement that they would cross under the pavement on a sharp skew angle, thereby creating a crossing of considerable length. At the hearing held before the Commission in this matter, the St. Louis County Water Company conceded that it would be necessary to alter and relocate certain of its facilities, and agreed that it would remove and alter same. Those facilities which the Company agreed to relocate are shown by means of red crosses on St. Louis County Water Company Exhibit No. 18.

"If the facilities involved in this matter were left in place, the pavement of the highway would be subjected to damage from breaks or leaks which might occur in the water lines, and also would be subjected to damage because of the necessity for cutting the highway pavement to obtain access to the water lines to connect or disconnect service. Damage to the highway from breaks or leaks can occur in one of two ways. If the force of water escaping from the water main is sufficient, the base supporting the pavement, and in some instances the pavement itself, can be eroded away. If the flow of water escaping from the water main is not of sufficient force to erode the surrounding soil, it can still result in a saturation of the base and subbase for the pavement, which, when subjected to heavy traffic, can result in pavement settlement and instability. New service connections to the main or the disconnection of existing services to the main are made either by tunneling under the pavement or cutting through the pavement to reach the main. The repair of breaks or leaks in

the main would also involve either cutting the pavement or tunneling under the pavement. In the event it should become necessary to cut the pavement to reach a main involved in this matter, the traffic using the highway would be hindered while the work was being done and while the pavement was being repaired. When any such cut is made in the pavement, there is a period of time that portions of the driving surface of the highway are blocked. This results in channeling all of the traffic on the highway into the remaining lanes, which not only slows down the movement of traffic upon the highway, but also create(s) a sharp hazard to the traffic. This hazard is especially prominent when such cuts are left open or barricaded at night. Even when the work involved can be performed on the shoulder of the highway, it still creates some hazard although perhaps not so great as if the work were being performed within the traveled way. When such work is performed on the shoulder it entails the use of machinery and men operating in close proximity to the traveled way, and motorists on the traveled way tend to veer away from any obstruction on the shoulder of the highway immediately adjacent to the lane in which they are traveling. Cuts in highway pavement for the purpose of connecting services and making repairs to water lines go on year around, which involves making repairs to cut pavement when weather conditions are not satisfactory for such work. A patch in a pavement offers a hindrance to traffic from that time on because of the unstable condition it creates, and constitutes a maintenance problem to Commission's maintenance forces in an effort to maintain as smooth a riding surface on the highway as possible. This problem is even more pronounced in those instances where the pavement repair is made during times when weather conditions are not satisfactory for such work. There have been instances where breaks in water lines underneath a highway pavement have resulted in extensive damage to the highway facility from the erosion of the support for the pavement, and, in some instances, by actually eroding away the pavement itself. Although the Water Company pointed out at the hearing instances where pavement had been laid over water lines with no damage resulting, there have been other instances where breaks occurred immediately after the completion of pavement, requiring the pavement to be cut to make repairs.

"During the construction of a highway such as that contemplated by the plans in the instant matter, it is standard practice for contractors to use heavy equipment. This equipment consists of heavy scoops used for the movement of earth, which carry a load as great as twenty-one cubic yards, and when empty have a weight in excess of that permitted by statute upon State highways. In addition to the heavy earth-movers, the grade for the highway is prepared by compaction with heavy sheepsfoot rollers. This heavy equipment is normally operated over the entire length and width of the highway right-of-way, and it would be impossible to properly construct the proposed highway here involved without such equipment being directly over the water lines involved, thus subjecting the water lines to considerable stress from the weight and vibration of the machinery, with the possibility of causing a break or leak in the water lines. In the construction of a highway improvement such as is contemplated by the plans in this matter, it is not unusual that during the period of construction the contractor will encounter material which is not satisfactory upon which to prepare a proper grade for the highway. When such unsatisfactory material is encountered during construction it is necessary that it be removed and replaced with satisfactory material. It is customary for the contractor to remove this material for the entire width of the earth-moving machinery in use on the job. If in this case such unsatisfactory material were encountered during construction and its removal conflicted with the location of the water line, the contractor would be delayed until adjustment could be made in the water

line. It cannot be determined whether such unsatisfactory material will be encountered until the construction is under way and the material in place is subjected to the compaction procedures.

"Based upon the foregoing, we are of the opinion that those water lines involved in this matter which, upon the completion of the proposed construction, would be located underneath the pavement of the highway should be relocated to another location within the highway right-of-way, except in those instances where the line will not be underneath the pavement a sufficient distance to make it impractical to reach the line without cutting the pavement. There are also instances where it is necessary for the water line to cross underneath the pavement from one side of the highway to the other, and this condition must be tolerated, since there is no other practical solution except to so install the water line that it will cross underneath the pavement within the shortest distance possible. We feel that, based on the above findings from the evidence in this matter, some of the facilities of the St. Louis County Water Company which it objects to relocating, if left in place, would interfere with the proper and economical construction and maintenance of said highway, and will tend to impede the lawful traffic thereon after reconstruction of the highway. There are, however, some of the facilities which the District Engineer originally ordered to be relocated that are not of sufficient degree of impediment to construction and maintenance of the highway, or traffic thereon, as to justify our requiring them to be relocated.

"We conclude that the location and removal of the facilities involved in this matter insofar as the public travel and traffic are concerned, and insofar as the same may interfere with the construction or maintenance of the highway is under the supervision of the State Highway Commission, and that the costs of altering the facilities as ordered hereby shall be borne by the St. Louis County Water Company.

"It is, therefore, the order of the Commission that, in addition to those facilities which the St. Louis County Water Company has agreed to alter and adjust, said Company shall cause its water transportation and distribution facilities to be relocated and altered substantially in the manner shown by red lines, words, and symbols on the plans attached hereto marked Exhibit A1 and incorporated by reference herein. The St. Louis County Water Company may at its election relocate said facilities to the locations shown by the blue lines on said Exhibit.

"Upon motion made, seconded, and unanimously carried, the Commission adopted the foregoing as its findings and order in this matter, and directed the Secretary to certify a copy hereof and serve same upon the St. Louis County Water Company."

The Company again petitioned for review of the decision of the Commission; the cause was submitted on the record, and the decision of the Commission was affirmed.

Appellant contends as upon the first appeal: (I) that the relocation order is unsupported by competent substantial evidence upon the whole record and is arbitrary, capricious, and unreasonable; (II) that the order is in excess of the Commission's authority, and not authorized by law because not based upon evidence but on a previously adopted policy of the Commission.

■■■ The Commission's power to order relocation under Section 227.240 and the extent of judicial review of decisions exercising that power are delineated in State ex rel. State Highway Commission v. Weinstein, Mo., 322 S.W.2d 778, 786, 787 [13–15]: "The question for determination of the Commission in the required hearing is whether the reconstruction of the highway in accordance with these plans makes it necessary to move these pipes to the proposed new location to prevent interference with the construction, maintenance,

or use of the reconstructed highway. Judicial review would be limited to the determination of whether, on all the evidence produced at the hearing, the Commission could reasonably have made findings which would show that the pipes in their present location would interfere with the construction, maintenance, or use of the reconstructed highway and which would make it reasonable to require their removal to the proposed new location." See also Jackson County Public Water Supply Dist. No. 1 v. State Highway Commission, Mo., 365 S.W.2d 553, 558. And, in respect to the previously mentioned policy, "The object of the hearing is not * * * to determine whether or not the policy should be applied. The object of the hearing is to determine whether or not the evidence shows that in the particular project the utility facilities would interfere with the construction, maintenance or use of the highway." St. Louis Water Co. v. State Highway Commission, supra, 386 S.W.2d l. c. 125.

Appellant questions neither the form of the Commission's findings nor the sufficiency of the basic findings for the inference and ultimate finding that the water mains in question would interfere with the construction, maintenance, and use of the relocated highway. The problem here is thus narrowed to determining whether, on all the evidence and aside from its statement of policy, the Commission, on remand, could reasonably have made the findings in its order.

It was shown that if left in place, facilities ordered relocated would, after construction, be under hard surface concrete pavement or newly compacted roadway shoulders. In the opinion of A. E. Brewer, a Senior Engineer with the Commission, it is not desirable to have water lines under pressure under road construction due to vulnerability to breaks, leaks, and the need to make connections, all of which damage a road or shoulder. Large leaks can wash away grade and subsurface. Small leaks saturate and weaken pavement support. Repairs thus occasioned cause cuts in the roadway which interfere with use and maintenance. Construction here would involve operation of heavy earth movers hauling 21 cubic yards of material and heavy sheeps-foot impacting rollers over the ground covering the mains. Vance C. Lischer, a Consulting Engineer for appellant, felt that such weights could be withstood by the Company's mains where covered by 21 inches of soil and where distributed over areas larger than the tires or tracks of such machine by hard pavements. He also recognized that the weight alone with less cover or without distribution would rupture pipe of the type used by the Company. Such heavy equipment is generally operated over the entire construction area and thus would be operated over the covering of any pipes located within the construction site. The plans in evidence show that this project would involve two 24-foot pavements divided by median with stabilized shoulders on either side of the pavements. The present grade surfaces would be graded additionally to the extent necessary to accommodate a 4-inch compacted granular base underlying the 9-inch pavement thickness. According to Mr. Brewer it is not always known how deep existing grade will have to be removed in order to get a satisfactory base for the pavement and granular material. "We often times on construction have to remove unsatisfactory material to a depth of several feet and replace that with satisfactory material and compact it, so therefore we do not know the amount of undergrading or subgrading necessary." Inferior or unsatisfactory materials could be expected to be encountered under any areas where pavement or previously stabilized shoulders had been. Much of the original concrete here would be covered rather than broken and removed but unsatisfactory material is found as well under old shoulders which would be graded or compacted in the project. "There is no base in the present shoulder. We will have to go down to the thickness of our new pavement, plus the base, plus any unsatisfactory material which we might find below it. Is it safe

to assume that we won't hit those? I don't think so." There was some testimony as to *average* depth of the Company's lines' exact depths being unknown, and Mr. Brewer felt from his experience in encountering water lines where not anticipated that excavation could go as low as such lines, in which case interference with and delay in construction would be occasioned. He recalled a break on Cypress Road on the Interstate 70 project which developed right after placement of new pavement over a Company water line. " * * * it resulted in a washout underneath the pavement and a necessary cut through this new pavement with the result of a patch. * * * we have had plenty of instances * * * where water lines started to leak or did break after new pavement was constructed over them. * * Q. Mr. Brewer, let's assume * * * that the lines that are involved in this hearing were to be left in place, could we be assured that in the construction of this highway we would not encounter some of those lines which would offer some interference to the actual construction of the highway? A. We could not, no. Q. And so far have you had an assurance that there would be no leaks encountered or no cuts made in the pavement for the installation of service connections? A. No sir. Q. Have you had any experience that would indicate to the contrary? A. Yes sir, as stated previously, we have had leaks and breaks under pavements that have required cutting the pavement and interference with traffic to repair those leaks or to replace a washed out roadway."

Roy Rucker, District Engineer for the Commission, described a water main break in the Mark Twain Expressway necessitating cutting, backfill, grouting and patching with accompanying interruption of use. On that job an unanticipated main was encountered which required construction changes. He also described "cut compaction" requiring excavation to 18 inches below pavement where unsatisfactory materials were encountered.

Leon Corder, Traffic Engineer for the Commission, described the obstruction and hindrance of traffic where breaks and leaks occurred both on the pavement and shoulders. It was his opinion that "there's almost invariably an interference with maintenance operations and with a soft shoulder, consequently an interference with traffic operations."

The Company offered evidence of previous projects in the immediate area in which new pavement had been laid over water lines; that through the use of bell joint clamps they could prevent joint leaks; that the probability of breaks in its lines was remote; and that anticipated connections could be accomplished without cutting or tunneling the road surface. Mr. Dolson of the Company described their manner of obtaining average pipe depth by gauging elevation of the pipe at 100–foot intervals. He conceded that some of the pipe would be closer to the surface than his average depth of 23 or so inches under cover, and "I testified to the fact there was one spot, 8 inches, Yes. * * * there is one other spot where I think the distance from the surface to the top would be about 24 inches. From the bottom of the compacted base the top would be around 10 or 11 inches." His experience data on line breaks did not take into consideration breaks occasioned by contractors and "accident."

The foregoing is not intended as an exhaustive review of the evidence but is merely to show that the findings of the commission are supported and are such as reasonably could have been reached by such fact-finding body, resolving, where necessary, the conflicts in the evidence. Being thus supported by the evidence, such findings are not arbitrary, capricious, or unreasonable, thus creating a situation in which this court may not substitute its discretion for that of the Commission. Stein v. State Tax Commission, Mo., 379 S.W.2d 495, 498 [3].

■ And since the Commission has made the findings for which remand was formerly ordered and such are shown to be supported by the record, it may no longer be said that the Commission's order was not based upon evidence but only upon policy.

Judgment affirmed.

HOUSER and WELBORN, CC., concur.

PER CURIAM.

The foregoing opinion by HIGGINS, C., is adopted as the opinion of the court.

All concur.

